UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___9/27/17___

CLARK P. RAY,

                              Plaintiff,

        -against-

DR. GAETAN ZAMILUS and KATHLEEN
GERBING,

                              Defendants.

**MEMORANDUM
OPINION & ORDER**

13 Civ. 2201 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        Plaintiff Clark P. Ray is a former inmate at Otisville Correctional Facility

("Otisville"). The Amended Complaint alleges that Defendants Dr. Gaetan Zamilus and

Superintendent Kathleen Gerbing acted with deliberate indifference in failing to provide Ray

with necessary medical treatment over an eleven month period while Ray was incarcerated at

Otisville. (Am. Cmplt. (Dkt. No. 23) ¶¶ 41-42)[1]

        Defendants have moved for summary judgement, contending that Plaintiff cannot

satisfy the objective and subjective elements of deliberate indifference under the Eighth

Amendment, and that Defendants are entitled to qualified immunity. (Def. Br. (Dkt. No. 87))

Ray argues that material issues of fact preclude a grant of summary judgment. (Pltf. Opp. Br.

(Dkt. No. 101))

---

[1] Unless otherwise indicated, (1) all cites are to the docket in the instant action; and (2) the page
numbers of documents referenced in this Order correspond to the page numbers designated by
this District's Electronic Case Filing system.

A.    **The Parties**

Ray served two terms of imprisonment in the New York State Department of Corrections and Community Supervision ("DOC") prison system. (Pltf. R. 56.1 Resp. (Dkt. No. 103) ¶¶ 1-2)  Ray's first term of incarceration ran from June 30, 1998 to January 4, 2011, while his second term ran from October 27, 2011 to May 25, 2013. (Id. ¶¶ 2-3)  During his second term of incarceration, Ray was held at several prisons.  In early 2012 he was transferred from Franklin Correctional Facility to Fishkill Correctional Facility ("Fishkill"). (Id. ¶ 22)  On April 23, 2012, he was transferred from Fishkill to Otisville Correctional Facility, where he remained until his release on May 25, 2013. (Id. ¶¶ 3, 62)

Defendant Zamilus is employed by DOC as the acting Facility Health Services Director at Otisville, and he was the only doctor assigned to Otisville's medical unit during the relevant time period (2012-2013). (Id. ¶¶ 5-6)  During this time, Dr. Zamilus worked as a "half-time physician (i.e., two days per week; seven-and-a-half hours per day) at Otisville and a half-time physician at Fishkill." (Id. ¶ 5)  Otisville held approximately 570 inmates in 2012. (Def. R. 56.1 Reply (Dkt. No. 108) ¶ 81)

---

[2] To the extent that this Court relies on facts drawn from a party's Local Rule 56.1 statement, it has done so because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence. See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted).  Where Plaintiff objects to Defendants' characterization of cited evidence, and has presented an evidentiary basis for doing so, the Court relies on Plaintiff's characterization of the evidence. See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion).  Unless otherwise indicated, the facts cited by the Court are undisputed.

Defendant Gerbing is the Superintendent of Otisville. (Pltf. R. 56.1 Resp. (Dkt. No. 103) ¶ 8) Her duties include providing "overall supervision of the facility's staff and inmates, including security, administration, and programs." (Gerbing Decl. (Dkt. No. 88) ¶ 2) Under DOC policy, however, the superintendent is not responsible for directing inmate medical care. (Id. ¶ 5)

B. **Hepatitis C**

In October or November of 2000, Ray was diagnosed with Hepatitis C. (Pltf. R. 56.1 Resp. (Dkt. No. 103) ¶ 11) It is undisputed that Ray suffered from chronic Hepatitis C during the period between April 23, 2012 and May 25, 2013, while he was incarcerated at Otisville. (Id. ¶¶ 4, 15)

Hepatitis C is a liver disease caused by the Hepatitis C virus ("HCV"), which can cause scarring of the liver known as "fibrosis." (Id. ¶¶ 12, 16; Nadler Decl., Ex. 5 (Koenigsmann Dep.) (Dkt. No. 102-5) at 161:19-25) There are four stages of fibrosis of the liver. Stage four fibrosis is known as "cirrhosis," also known as "liver failure." (Nadler Decl., Ex. 5 (Koenigsmann Dep.) (Dkt. No. 102-5) at 161:16-17, 162:5-11) "[T]here is much more urgency to treat" patients suffering from advanced fibrosis, because it may be too late to treat a patient once the disease has progressed to cirrhosis. (Id. at 201:4-16, 203:10-21) It is undisputed that Ray's disease had progressed to stage three by the time Ray had arrived at Otisville. (Pltf. R. 56.1 Resp. (Dkt. No. 103) ¶¶ 4, 15; Def. R. 56.1 Reply (Dkt. No. 108) ¶ 68)

The extent to which Hepatitis C has progressed is a key determinant of whether medical treatment is necessary. Dr. Zamilus and Dr. Carl Koenigsmann – Deputy Commissioner and Chief Medical Officer of DOC – testified that DOC policy as of August 2012 was that those inmates without fibrosis "will not be treated"; those with stage one fibrosis "will be evaluated on

3

an individual basis"; and those with stage two fibrosis or above "will be offered treatment." (Def. R. 56.1 Reply (Dkt. No. 108) ¶ 91)

During the relevant time period (2012-2013), the state-of-the-art treatment for Hepatitis C was a drug cocktail made up of Ribavirin, Peginterferon, and Telaprevir. (Pltf. R. 56.1 Resp. (Dkt. No. 103) ¶ 26) Peginterferon may cause "[l]ife-threatening or fatal neuropsychiatric reactions[,] including suicidal ideation, homicidal ideation, [and] depression . . . with or without previous psychiatric illness." (Id. ¶ 27) Moreover, a Hepatitis C patient who did not complete the full prescribed course of treatment with Telaprevir faced a significant risk that his disease would become drug-resistant. (Id. ¶¶ 48-49)

### C.     Liver Biopsy While at Fishkill

On March 16, 2012 – during Ray's incarceration at Fishkill – Dr. Zamilus conducted a pre-operation physical on Ray to assess whether he could undergo a liver biopsy to analyze the status of his Hepatitis C. (Id. ¶ 23) On March 28, 2012, Ray underwent a liver biopsy at Fishkill. (Id. ¶ 25)

The results of Ray's liver biopsy became available on April 5, 2012. The biopsy results indicated that Ray had chronic Hepatitis C, stage three fibrosis. (Def. R. 56.1 Reply (Dkt. No. 108) ¶ 68) A nurse's notes from April 23, 2012 state that Ray was "[r]equesting the results of his biopsy done on 3-28-12 also info about treatment for Hep C," and that a follow-up appointment had been scheduled for May 22, 2012. (Nadler Decl., Ex. 36 (Apr. 23, 2012 Progress Notes) (Dkt. No. 102-39) at 2) The nurse's notes further state, "Told PCP to review

results + notify him. Has appointment to F/U PCP + discuss Tx. Chart to PCP to review results."[3] (Id.)

Ray testified that he was informed at Fishkill that he "was ready for a treatment plan" and that "as soon as [he] arrived [at his] next facility" – Otisville – "it was in [his] file that [he] was ready for a treatment plan to start treatment for chronic Hepatitis C." (Nadler Decl., Ex. 8 (Ray Dep.) (Dkt. No. 102-8) at 95:11-96:6; see Nadler Decl., Ex. 33 (Mar. 1, 2012 Request and Report of Consultation) (Dkt. No. 102-36) at 2 ("PT meets criteria for Hep C Tx. Please schedule for BA seline liver BX to determine extent of liver damage and consideration for Hep C Tx."))

### D. Medical Treatment at Otisville

Ray was transferred to Otisville on April 23, 2012. (Pltf. R. 56.1 Resp. (Dkt. No. 103) ¶ 3) Ray claims that he did not receive proper medical care at Otisville during the period between April 23, 2012 and March 5, 2013, when he began multi-drug therapy for his Hepatitis C disease. (Id. ¶¶ 3, 61)

Under DOC Policies on Health Screening of Inmates, when an inmate is transferred to a new facility, he first meets with a facility nurse to undergo a health screening and receive orientation concerning health care services, including the procedures for Sick Call. (Id. ¶ 31; Koenigsmann Decl., Ex. G (Dkt. No. 91-7)) On Ray's first day at Otisville – April 23, 2012 (Pltf. R. 56.1 Resp. (Dkt. No. 103) ¶ 3) – he requested treatment for his Hepatitis C condition. (Id. ¶ 28; Def. R. 56.1 Reply (Dkt. No. 108) ¶ 85; Nadler Decl., Ex. 8 (Ray Dep.) (Dkt. No. 102-8) at 133:24-135:15, 156:9-157:5)

---

[3] Testimony from Dr. Zamilus and Dr. Koenigsmann establishes that "TX" refers to treatment; "F/U" refers to follow up; and "PCP" refers to primary care physician. (See Nadler Decl., Ex. 5 (Koenigsmann Dep.) (Dkt. No. 102-5) at 242:5-12; id., Ex. 10 (Zamilus Dep.) (Dkt. No. 102-10) at 200:8-12)

Ray visited Sick Call at Otisville on July 2, 2012 and July 3, 2012. Progress Notes from the July 2, 2012 Sick Call visit state that Ray was "coughing up green stuff" and "snotting up a lot." (Nadler Decl., Ex. 35 (Progress Notes) (Dkt. No. 102-38) at 2) The progress notes also report that Ray "would like Tx for Hep C." (Id.) Dr. Zamilus's notes concerning Ray's July 3, 2012 visit state that Ray had "cold symptoms," "fever + chills," and "general malaise." (Nadler Decl., Ex. 24 (Progress Notes) (Dkt. No. 102-27) at 2) Ray was held in the infirmary overnight and Dr. Zamilus signed Ray's discharge summary, which indicated that Ray had "no malaise." (Id.; see Nadler Decl., Ex. 10 (Zamilus Dep.) (Dkt. No. 102-10) at 197:19-198:1; Nadler Decl., Ex. 8 (Ray Dep.) (Dkt. No. 102-8) at 210:9-13 ("When I went to sick call, on several occasions, I complained of cold and flu-type symptoms, severe abdominal pains, fatigue, vomiting, diarrhea, and feeling like I had been run down by a dump truck."))

On August 21, 2012, Ray had his first scheduled appointment with Dr. Zamilus at Otisville. (Pltf. 56.1 Resp. (Dkt. No. 103) ¶ 33) Dr. Zamilus's notes of this visit reflect the following: "Hep C treatment [was] discussed"; "lab ordered PT/PTT, V[iral ] L[oad], Hep B s[urface] [antibody], will do E-form after lab/psych eval[uation]." (Nadler Decl., Ex. 40 (Aug. 21, 2012 Progress Note) (Dkt. No. 102-43) at 2; see also Nadler Decl., Ex. 10 (Zamilus Dep.) (Dkt. No. 102-10) at 222:6-15 (Zamilus testimony that this is "a note that I saw the patient, follow-up Hep C, I put patient interested in treatment, RX, and I put abdominal negative, so that means I checked the abdomen, he didn't have any complaint, and I put my assessment Hep C treatment discussed, lab order[ed], these are the lab[s] that I ordered, PT/PTT, viral load, VL, and also check Hep B surface antibody, and I added will do e-form after labs slash psych evaluation, eval or evaluation"); id. at 277:19-25 (Zamilus testimony that "PT/PTT" stands for "[p]rothrombin time, partial prothrombin"); Nadler Decl., Ex. 5 (Koenigsmann Dep.) (Dkt. No.

102-5) at 166:18-167:2 (Koenigsmann testimony that in order to treat a patient with Hepatitis C, "you have to have a measurable viral load, meaning that you have an active hepatitis C infection")) That same day, Dr. Zamilus made a referral for Ray to receive a psychiatric evaluation and additional lab work. (Pltf. Resp. to 56.1 (Dkt. No. 103) ¶¶ 36, 39)

Dr. Zamilus states in his declaration that he "understood that a psychiatric evaluation was part of the clearance required by [DOC] to obtain final approval to start Hepatitis C treatment." (Zamilus Decl. (Dkt. No. 93) ¶ 17) Dr. Zamilus further states that

> [i]t was my understanding and belief that I could not start Plaintiff's Hepatitis C treatment without having a definite continuity care plan finalized. Due to the risk that the virus could develop resistance to drug therapy if the course of treatment is not completed, it was critical to successful treatment, and [DOC] policy, to ensure that a plan for continuity of care was in place prior to starting treatment if the inmate could be released before the treatment's completion.

(Id. ¶ 26) The standard course of drug treatment for a Hepatitis C patient in Plaintiff's condition ran forty-eight weeks. (Pltf. R. 56.1 Resp. (Dkt. No. 103) ¶ 45)

Dr. Koenigsmann states that he "required the [DOC] Infection Control Unit to consult and advise on situations where there was a potential that an inmate would not finish the entire course of the prescribed triple therapy," due to concerns about drug resistance. (Koenigsmann Decl. (Dkt. No. 91) ¶ 11) Ray's conditional release date was in April 2013. (Pltf. R. 56.1 Resp. (Dkt. No. 103) ¶ 47)

DOC's Hepatitis C Primary Care Guidelines (the "Guidelines" or "DOC Guidelines") provide that

> Anti-HCV therapy should be considered in accordance with the following criteria:
>
> . . . .
>
> 10. No history of major depression or other major psychiatric illness unless cleared by a psychologist or psychiatrist to receive anti-HCV treatment. A history of suicide attempts is generally regarded as an absolute contraindication of treatment.

7

. . . .

13. The primary care provider should assess if the inmate will be incarcerated for the duration of the required HCV treatment. If there is a possibility that the inmate will be released prior to completion of treatment[,] then the provider should have the inmate sign the Hepatitis C Continuity Program Acceptance Form . . . . Upon the patient[']s agreement to participate and comply with the Hepatitis [C] Continuity Program the provider will contact the Regional Infection Control Nurse to initiate the enrollment process into the Continuity Program.

(Nadler Decl., Ex. 23 (DOC Guidelines) (Dkt. No. 102-24) at 7-8)

Ray's next appointment with Dr. Zamilus was on November 29, 2012. Ray and Dr. Zamilus again discussed the treatment for Ray's Hepatitis C condition. (Pltf. R. 56.1 Resp. to 56.1 (Dkt. No. 103) ¶ 43) Dr. Zamilus claims that on December 13, 2012, he sent Dr. Koenigsmann a request for Hepatitis C treatment via an e-file form. (Zamilus Decl. (Dkt. No. 93) ¶ 20) Although the record contains a "Hep C Treatment Request" form dated December 13, 2012 that contains Ray's name, the form does not indicate to whom it was sent, or whether any action was taken in response to the request. (Zamilus Decl., Ex. A (Dec. 13, 2012 Hep C Treatment Request) (Dkt. No. 93-1) at 5)

Dr. Koenigsmann states in his declaration that on October 24, 2012, he issued a "Revision Notice" to medical staff stating that there was a "new [DOC] Hepatitis C Treatment Request E-Form." (Koenigsmann Decl. (Dkt. No. 91) ¶ 8) Dr. Koenigsmann testified that if Dr. Zamilus submitted the request to him using the new system in December 2012, he would have a record of that submission, but no such record exists. (Nadler Decl., Ex. 5 (Koenigsmann Dep.) (Dkt. No. 102-5) at 258:16-259:1, 260:4-14)[4]

---

[4] Dr. Koenigsmann testified that the transition to the new Outlook e-form system was made in about August 2012, and that Dr. Zamilus should have been aware of the system switch at least four months before he requested Ray's Hepatitis C treatment. (Id. at 259:2-260:3)

On January 23, 2013, Ray filed a grievance complaining that he had not received treatment for his Hepatitis C condition. (Nadler Decl., Ex. 67 (First Grievance) (Dkt. No. 102-70) at 2-13)[5]

In a January 31, 2013 e-mail to Dr. Koenigsmann, Dr. Zamilus reported that Ray had filed a grievance complaining that his Hepatitis C treatment was being delayed. (Koenigsmann Decl., Ex. D (E-Mail Exchange) (Dkt. No. 91-4) at 1) In his email, Dr. Zamilus asks, "Can you tell me where are we on the application, Eform for his hep c. I sent it around early December." (Id.)

Later that day, Dr. Koenigsmann replied:

> I have no approval listed under this pt. If not approved I would have sent you a response asking for more info etc[.], I have no record of any e mail sent to you regarding this pt. I recommend that you send me the Outlook treatment request again. We are not using the sysm e mail requests any longer as is noted in the Hep C tx practice guideline addendum. If you are unclear what request to use please contact me.

---

[5] On February 1, 2013, the Inmate Grievance Resolution Committee ("IGRC") issued a split decision concerning Ray's grievance. Some members of the IGRC concluded that Ray's grievance was "outside the purview of the IGRC," while others recommended that Ray be given "immediate medical treatment for his chronic illness, due to the serious nature of [his] disease, which cause[s] permanent liver damage." The IGRC recommended that Ray's grievance be "sen[t] to Superintendent [Gerbing] for review." (Nadler Decl., Ex. 68 (IGRC Split Decision) (Dkt. No. 102-71) at 2)

On February 6, 2013, Superintendent Gerbing denied Ray's grievance, agreeing that it was outside the purview of the IGRC:

> This grievance has been investigated and responded to by the Facility Health Services Director of the facility, Dr. Zamilus. Per Dr. Zamilus, the grievant was last seen 11/29/12 regarding his Hepatitis C. On December 13, 2012 a request to begin Hepatitis C treatment was submitted to the Medical Director in Albany. The medical department is currently waiting for a response.

> All actions are outside the purview of the IGRC. The medical department has done their part in putting in the request to begin treatment. However, they are waiting for approval from Albany prior to beginning such treatment.

(Nadler Decl., Ex. 58 (Gerbing Grievance Response) (Dkt. No. 102-61) at 2)

(Id.)[6]

That same day, Dr. Zamilus submitted an email request to Dr. Koenigsmann for

"HEPC Treatment" for Ray. (Nadler Decl., Ex. 50 (Jan. 31, 2013 E-Mail Request) (Dkt. No.

102-53) at 2-4) Dr. Koenigsmann approved the request later that day. (Nadler Decl., Ex. 42

(Jan. 31, 2013 E-Mail Response) (Dkt. No. 102-45) at 2) At his deposition, Dr. Koenigsmann

testified that he generally approved Hepatitis C treatment requests within "twenty minutes to a

half an hour." (Nadler Decl., Ex. 5 (Koenigsmann Dep.) (Dkt. No. 102-5) at 253:11-19)

In approving Ray's treatment on January 31, 2013, Dr. Koenigsmann informed

Dr. Zamilus that Ray's conditional release date was scheduled for April 2013 – before the 48-

week Hepatitis C treatment would be completed. Dr. Koenigsmann "recommend[ed] referral to

the continuity program," and suggested that Dr. Zamilus "contact the Regional Infection Control

Nurse." (Nadler Decl., Ex. 42 (Jan. 31, 2013 E-Mail Response) (Dkt. No. 102-45) at 2; see Pltf.

R. 56.1 Resp. (Dkt. No. 103) ¶ 47)

Ray's psychological evaluation – which Dr. Zamilus had requested on August 21,

2012 – occurred on February 5, 2013. (Pltf. R. 56.1 Resp. (Dkt. No. 103) ¶ 51)

On February 7, 2013, Nurse Becky Reddish met with Ray to explain the

Continuity of Care Program. (Id. ¶ 53) Ray told Nurse Reddish where he expected to be living

after he was released. Nurse Reddish determined that the closest medical provider that could

continue Ray's Hepatitis C treatment was located approximately 150 miles away. (Id. ¶ 54)

---

[6] Dr. Koenigsmann states in his declaration that "[o]n December 13, 2012, according to
Plaintiff's medical records, Dr. Zamilus filled out and sent to me a request for Hepatitis C
treatment for Plaintiff via the new e-file form. . . . However, on January 31, 2013, since I could
not locate the initial e-form request sent by Dr. Zamilus on December 13, 2012, I instructed Dr.
Zamilus to re-send the treatment request form." (Koenigsmann Decl. (Dkt. No. 91) ¶ 9)

Accordingly, on February 22, 2013, Ray signed a waiver to stay in prison beyond

his conditional release date. (Nadler Decl., Ex. 60 (Ray Waiver) (Dkt. No. 102-63) at 5) The

next day, Ray signed an addendum to his waiver stating:

> It should be made clear that my waiver of my April 7, 2013, conditional release date was
> done solely to receive treatment for my hepatitis C. Without the agreement from Health
> Services to treat my hepatitis C, I would not have any reason or desire to waive my
> conditional release. Finally, it should be mentioned that although I have been required to
> sign a waiver of my conditional release date, my treatment for hepatitis C has not yet
> begun.

(Id. at 3)

On April 21, 2013, Ray filed a second grievance seeking to be released from

prison and to rescind his waiver of his conditional release date. (Nadler Decl., Ex. 59 (Second

Grievance) (Dkt. No. 102-62) at 2-4) In his second grievance, Ray states:

> On February 14, 2013, I, Clark P. Ray (Grievant), was informed by Dr. Gaetan Zamilus,
> Health Service Director, that to receive treatment for my hepatitis C (HCV) infection I
> would have to agree to remain incarcerated beyond my conditional release date of April
> 7, 2013.

> On February 22, 2013 I was informed by Ms. Reddish of Disease Control, that to begin
> treatment for my HCV infection I must sign a waiver of my conditional release date.

> On February 22, 2013 I was given a waiver of my conditional release date to sign and
> return for distribution. I signed the waiver and gave it to Mr. Richard Colon, Offender
> Rehabilitation Coordinator . . .

> On February 24, 2013, I served Mr. Richard Colon with an Addendum to the Conditional
> Release Waiver signed February 22, 2013. . . .

> I have repeatedly asked the Health Service Department, to place me in the continuity
> program. My request began September of 2012. . . .

(Id. at 3)

Dr. Zamilus testified that Ray signed a conditional release waiver "[b]ecause . . .

we could not start treatment until he agreed to stay for the treatment." (Nadler Decl., Ex. 10

(Zamilus Dep.) (Dkt. No. 102-10) at 314:3-5) Dr. Koenigsmann states in his declaration that

"[f]rom approximately February 7, 2013, to February 28, 2013, the [DOC] Infection Control

Unit and I were considering whether Plaintiff should begin his Hepatitis C treatment without

having a definite continuity of care plan in place. Dr. Zamilus did not participate in my

conversations with Ellen Turner and Becky Reddish of the [DOC] Infection Control Unit, and

did not participate in the decision of whether Plaintiff should begin treatment." (Koenigsmann

Decl. (Dkt. No. 91) ¶ 12)

On March 5, 2013, Ray began the triple drug therapy treatment for Hepatitis C.

(Pltf. Resp. to 56.1 (Dkt. No. 103) ¶ 61) On May 25, 2013, Ray was released from Otisville,

with continuity of care in place in Albany. (Id. ¶ 62) Ray completed his treatment on September

18, 2013. (Id. ¶ 64) Although the standard course of therapy with the three-drug protocol runs

forty-eight weeks, Ray's treatment was terminated much earlier – at about twenty-eight weeks.

Ray's treatment was ended early, because his system was found to contain no active Hepatitis C

infection. (Id. ¶ 45 (citing Nadler Decl., Ex. 10 (Zamilus Dep.) (Dkt. No. 102-10) at 316:24-

319:5; Nadler Decl., Ex. 23 (DOC Guidelines) (Dkt. No. 102-26) at 12; Nadler Decl., Ex. 53

(Aug. 21, 2015 Follow-Up Appointment) at 2)) As of August 21, 2015, Ray remained virus-free.

(Nadler Decl., Ex. 53 (Aug. 21, 2015 Follow-Up Appointment) at 2)

## DISCUSSION

### I.  SUMMARY JUDGMENT STANDARD

Summary judgment will be granted where "the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." De Los Santos v. HYS Livery Serv., Inc., No. 12 Civ. 8124 (LTS) (JCF), 2014 WL

1979924, at *2 (S.D.N.Y. May 14, 2014); see Fed. R. Civ. P. 56(a). A fact is considered material

"if it 'might affect the outcome of the suit under the governing law,' and an issue of fact is a

genuine one where 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Holtz v. Rockefeller & Co. Inc., 258 F.3d 62, 69 (2d Cir. 2001) (quoting Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248 (1986)).

The Second Circuit has instructed that "[t]he party against whom summary judgment is sought . . . 'must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.'" Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (emphasis omitted)); see De Los Santos, 2014 WL 1979924, at *2.

## II.  STANDARD FOR EIGHTH AMENDMENT CLAIMS

To establish an Eighth Amendment violation arising out of inadequate medical treatment, a prisoner must prove "deliberate indifference to [his] serious medical needs." Estelle v. Gamble, 429 U.S. 97, 104 (1976).  "A prisoner must satisfy two requirements – one objective and one subjective – in order to prevail on such a 'deliberate indifference' claim." Johnson v. Wright, 412 F.3d 398, 403 (2d Cir. 2005) (citing Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)).  First, the prisoner must prove that the alleged deprivation of medical treatment is – in objective terms – "sufficiently serious," that is, the prisoner must prove that his medical need was "a condition of urgency, one that may produce death, degeneration, or extreme pain." See id. (citing Hemmings v. Gorczyk, 134 F.3d 104, 108 (2d Cir. 1998) (quoting Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996))).  Second, the prisoner must prove that the charged official acted with a "sufficiently culpable state of mind." Salahuddin v. Goord, 467 F.3d 263, 280 (2d Cir. 2006).  "This requires that the prisoner prove that the charged official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he

13

must also draw the inference.'" Johnson, 412 F.3d at 403 (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)).

Deliberate indifference exists when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Farmer, 511 U.S. at 847. "Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm." Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994). "Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation." Smith v. Carpenter, 316 F.3d 178, 183-84 (2d Cir. 2002) (citing cases).

"It is well-established that Hepatitis C qualifies as a serious medical condition for purposes of an Eighth Amendment analysis." Pabon v. Wright, No. 99 Civ. 2196 (WHP), 2004 WL 628784, at *1 (S.D.N.Y. Mar. 29, 2004), aff'd, 459 F.3d 241 (2d Cir. 2006). Where a plaintiff "suffered from a delay in treatment, rather than a complete lack of treatment, [however,] the objective element must be satisfied by harm that resulted from the delay." Graham v. Wright, No. 01 Civ. 9613 (NRB), 2004 WL 1794503, at *5 n.7 (S.D.N.Y. Aug. 10, 2004), aff'd, 136 F. App'x 418 (2d Cir. 2005) (citing Smith, 316 F.3d at 186)).

Courts (and juries) may "consider the absence of adverse medical effects in evaluating the objective sufficiency of [an] Eighth Amendment claim." Smith, 316 F.3d at 187 ("The absence of adverse medical effects or demonstrable physical injury is one such factor that may be used to gauge the severity of the medical need at issue.") (citing cases). "Indeed, in most cases, the actual medical consequences that flow from the alleged denial of care will be highly

relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." Id.

Proof of actual physical harm is not required, however. "[A]n Eighth Amendment claim may be based on a defendant's conduct in exposing an inmate to an unreasonable risk of future harm and . . . actual physical injury is not necessary in order to demonstrate an Eighth Amendment violation." Id. at 188 (citing Helling v. McKinney, 509 U.S. 25, 35 (1993) (the potential future health risk caused by exposure to second hand smoke may form the basis for relief under the Eighth Amendment)). "'[A]lthough demonstrable adverse medical effects may not be required under the Eighth Amendment, the absence of present physical injury will often be probative in assessing the risk of future harm.'" DiChiara v. Wright, No. 06 Civ. 6123 (KAM) (LB), 2011 WL 1303867, at *7 (E.D.N.Y. Mar. 31, 2011) (quoting Smith, 316 F.3d at 188).

## III. ANALYSIS

Defendants argue that (1) Ray cannot satisfy either the objective or subjective elements of his deliberate indifference claim against Dr. Zamilus; (2) Superintendent Gerbing had no personal involvement, because she "never participated in Plaintiff's Hepatitis C treatment or supervised Dr. Zamilus' treatment of Plaintiff's Hepatitis C"; and (3) both Defendants are entitled to qualified immunity. (Def. Br. (Dkt. No. 87) at 17-26)

Ray argues, however, that for an "eleven month span, the minimal attention that Dr. Zamilus provided to Mr. Ray was 'so woefully inadequate as to amount to no treatment at all.'" (Pltf. Opp. Br. (Dkt. No. 101) at 23 (quoting Johnson, 234 F. Supp. 2d at 360)) As to Superintendent Gerbing, Ray argues that she "was personally involved in the denial of Mr. Ray's medical care through her role in rejecting his grievance" (id. at 28-29), and that she "is responsible for the violation of Mr. Ray's Eighth Amendment rights because she was 'aware of

the [under]staffing problem [at Otisville] but fail[ed] to take corrective action.'" (Id. at 31 (quoting Greason v. Kemp, 891 F.2d 829, 838 (11th Cir. 1990)) Ray also asserts that "[n]either Defendant has established an affirmative defense of qualified immunity." (Id. at 32)

## A.   Delay of Treatment v. Denial of Treatment

"Eighth Amendment cases regarding inadequate medical care generally fall into two categories: denial of treatment and delay in treatment [and . . .] the analyses are subtly different." Ippolito v. Goord, No. 05 Civ. 6683 (MAT), 2012 WL 4210125, at *9 (W.D.N.Y. Sept. 19, 2012).

In the Amended Complaint – filed while Ray was proceeding pro se, Ray asserts a claim for "delay in treatment" under the Eighth Amendment. (See Am. Cmplt. (Dkt. No. 23) ¶¶ 11, 44) In opposing Defendants' motion for summary judgment, however, Ray – now represented by counsel – argues that he was "denied treatment for his advanced Hepatitis C from April 2012 through March 2013" and that "Defendants incorrectly classify this action [as] a 'delay of treatment' case in order to heighten Mr. Ray's burden." (Pltf. Opp. Br. (Dkt. No. 101) at 21)

There is evidence before the Court showing that (1) Ray requested treatment for his Hepatitis C when he arrived at Otisville on April 23, 2012 (Pltf. R. 56.1 Resp. (Dkt. No. 103) ¶¶ 3, 28; Def. R. 56.1 Reply (Dkt. No. 108) ¶ 85; Nadler Decl., Ex. 8 (Ray Dep.) (Dkt. No. 102-8) at 133:24-135:15, 156:9-157:5); (2) Ray began treatment on March 5, 2013, while incarcerated at Otisville (Pltf. R. 56.1 Resp. (Dkt. No. 103) ¶ 61); (3) Ray was released from Otisville on May 25, 2013, with continuity of care in place (id. ¶ 62); (4) as of May 30, 2013, there was no evidence of the Hepatitis C virus in Ray's system (id. ¶ 63); (5) Ray completed his

treatment on September 18, 2013 (id. ¶ 64); and (6) there continues to be no evidence of the

Hepatitis C virus in Ray's system. (Id.)

Given this record, this Court concludes that this case involves a delay in

treatment, rather than a denial of treatment. See, e.g., Graham, 2004 WL 1794503, at *5

(plaintiff was diagnosed with Hepatitis C on March 12, 2001 but his drug therapy did not begin

until February 26, 2003; court addressed Eight Amendment claim as a "delay in treatment"

case); DiChiara, 2011 WL 1303867, at *7 (plaintiff contended that defendant had provided no

treatment for his Hepatitis C condition for one year; court addressed Eight Amendment claim as

a "delay in treatment" case).

### B. Ray Has Not Offered Sufficient Evidence to Satisfy the Objective Prong of an Eighth Amendment Deliberate Indifference Claim

Defendants argue that Ray "does not meet the objective component [of his

deliberate indifference claim] because the undisputed facts show that the alleged delay did not

exacerbate his condition or worsen his prognosis for effective treatment." (Def. Br. (Dkt. No.

87) at 18) Ray argues, however, that summary judgment is precluded because "[d]uring the

eleven months that Mr. Ray was denied treatment, he not only suffered from severe abdominal

pain, but also nausea, diarrhea, cold- and flu-like symptoms, and intense fatigue." (Pltf. Opp. Br.

(Dkt. No. 101) at 22)

As noted above, in order to establish an Eighth Amendment violation for

deliberate indifference, plaintiff must satisfy both an objective and a subjective element. See

Smith, 316 F.3d at 183. To satisfy the objective prong of an Eighth Amendment claim, a

plaintiff's injury must be sufficiently serious. See id. at 184 (holding that "'[b]ecause society

does not expect that prisoners will have unqualified access to health care,' a prisoner must first

make this threshold showing of serious illness or injury in order to state an Eighth Amendment claim for denial of medical care") (quoting Hudson v. McMillan, 503 U.S. 1, 9 (1992)).

Moreover, where an inmate alleges a delay in treatment – rather than an absolute denial of treatment – "it is appropriate to focus on the challenged delay . . . in treatment rather than the prisoner's underlying medical condition alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious' to support an Eighth Amendment claim." Id. at 185 (quoting Chance, 143 F.3d at 702) (emphasis in Smith). "A defendant's delay in treating an ordinarily insignificant medical condition can become a constitutional violation if the condition worsens and creates a 'substantial risk of injury.'" Graham, 2004 WL 1794503, at *4 (quoting Smith, 316 F.3d at 186). "Conversely, delay in treating a life-threatening condition may not violate the Eighth Amendment if the lapse does not cause any further harm beyond that which would occur even with complete medical attention." Id. (citing Smith, 316 F.3d at 186).

In sum, "the case law clearly establishes that the delay in treatment does not become a constitutional violation merely because the underlying medical condition, here, Hepatitis C, is indisputably a serious one." DiChiara, 2011 WL 1303867, at *7. "The court must instead look to 'all relevant facts and circumstances' when determining whether a delay in treatment is 'objectively serious' for Eighth Amendment purposes." Id. (quoting Smith, 316 F. 3d at 187). In determining whether a delay in treatment is "objectively serious" for Eighth Amendment purposes, courts and juries are "entitled to consider the absence of adverse medical effects" associated with the delay in treatment. Smith, 316 F.3d at 187.

Although the Second Circuit has "never required plaintiffs alleging a denial of adequate medical care in a Section 1983 action to produce expert medical testimony," Hathaway, 37 F.3d at 68, multiple district courts in this Circuit, and at least four Circuit courts, have

concluded that a plaintiff who complains that a delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment. See, e.g., Bennett v. Erie Cty. Holding Ctr. Med. Dep't, No. 03 Civ. 6393 (P), 2006 WL 897817, at *9 (W.D.N.Y. Mar. 31, 2006) (granting summary judgment where "[plaintiff] has not shown that the surgery should have been performed sooner . . . or that substantial harm resulted from the delay. . . . He has simply offered no persuasive medical evidence that surgery should have been conducted during the period of time that he was incarcerated . . . or that his offset jaw resulted from the failure to perform such surgery during that time frame."); R.T. v. Gross, 298 F. Supp. 2d 289, 296-97 (N.D.N.Y. 2003) (granting summary judgment "[b]ecause Plaintiff has not submitted any verifiable evidence indicating that a failure to treat his condition adversely affected his prognosis"); Llorente v. Rozeff, No. 99 Civ. 1799, 2001 WL 474261, at *4 (N.D.N.Y. Apr. 12, 2001) (granting summary judgment where plaintiff "acknowledges that he has not identified any expert who will testify that his injury was aggravated as a result of the claimed delay in medical treatment . . . and admits that no medical records exist which supports that a delay in medical care resulted in aggravation of his injury"); see also Smith, 316 F.3d at 186 (citing Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1188-89 (11th Cir. 1994) for the proposition that the "delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for delay"); Williams v. Liefer, 491 F.3d 710, 714-15 (7th Cir. 2007) ("In cases where prison officials delayed rather than denied medical assistance to an inmate, courts have required the plaintiff to offer 'verifying medical evidence' that the delay (rather than the inmate's underlying condition) caused some degree of harm. . . . That is, a plaintiff must offer medical evidence that tends to

confirm or corroborate a claim that the delay was detrimental."); Surber v. Dixie County Jail, 206 Fed. Appx. 931, 933 (11th Cir. 2006) (same); Laughlin v. Schriro, 430 F.3d 927, 929 (8th Cir. 2005) (same); Napier v. Madison Cty., Ky., 238 F.3d 739, 742 (6th Cir. 2001) ("[a]n inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed").

Numerous courts have considered whether a delay in providing treatment for Hepatitis C rises to the level of an Eighth Amendment violation. Where such claims have survived summary judgment, they generally have been supported by medical evidence demonstrating that the delay in treatment either made the eventual treatment less effective, or presented a risk that treatment would be less effective. See, e.g., Parks v. Blanchette, 144 F. Supp. 3d 282, 314 (D. Conn. 2015) (finding that plaintiff "introduced evidence sufficient to raise a genuine question of material fact as to whether the delay in receiving Hepatitis C treatment was sufficiently serious" where plaintiff's expert "has indicated that a delay in treatment for Hepatitis C decreases its effectiveness"); Ippolito, 2012 WL 4210125, at *11-12 (where treatment for Hepatitis C had been delayed for seven to nine years, and plaintiff had offered expert testimony that early treatment presented a better chance of arresting the disease's progression, plaintiff had offered evidence sufficient to raise a triable question of fact on the objective prong); DiChiara, 2011 WL 1303867, at *7-8 (finding that "the evidence proffered was sufficient to raise a question of fact regarding the seriousness of the delay in treatment" where "plaintiff . . .

presented the affidavit and testimony of his expert, Dr. Klion, which . . . supports plaintiff's

position that the delay in treatment was serious").[7]

Conversely, where a plaintiff has not offered medical evidence demonstrating

disease progression or a worse prognosis, defendants have been granted summary judgment.

See, e.g., Byng v. Wright, No. 09 Civ. 9924 (PKC) (JCF), 2012 WL 967430, at *10 (S.D.N.Y.

Mar. 20, 2012) (finding that plaintiff's "allegation [of a delay in treatment of his Hepatitis C] . . .

fails under both prongs of the deliberate indifference standard," because he "comes forward with

no evidence that he sustained a serious adverse health effect between his September 27[, 2007]

---

[7] The DiChiara court relied on extensive medical evidence in finding "a question of fact about whether the delay in treating his HCV was 'objectively serious'": Plaintiff's expert, "Dr. Klion[,] stated that treatment should be initiated '[o]nce diagnosis of hepatitis C is established and there is evidence of progressive disease' because treatment at that stage 'has the best chance of arresting the disease'. . . . Further, Dr. Klion stated that 'treatment with interferon, which is one of the drugs used in treating hepatitis C, protects the liver from further damage by slowing scarring and is therefore beneficial even to patients who end up being non-responders." DiChiara, 2011 WL 1303867, at *8.

Moreover, the record demonstrated that "prior to the delay in treatment, plaintiff possessed only one of the negative predictors to treatment, his genotype, and not the other, the high viral load. It was only after the delay that his viral load increased . . . and that his chances of succeeding in the treatment decreased even further." Id. at *7. In DiChiara, unlike here, plaintiff also failed to clear the virus to undetectable amounts during his first 48-week course of treatment. See id. "Plaintiff was left with two options after this: leave the infection untreated, risking cirrhosis of the liver, cancer, or death, or go through a second round of treatment, enduring the number of side effects associated with the antiviral therapy." Id.

> [A]lthough Dr. Klion could not quantify how the success in treatment would be affected by a delay, it was his expert opinion that early treatment presented a better chance of arresting progression of the disease and protecting the liver. While plaintiff was ultimately successful in clearing the virus after he was released from prison, he has still presented sufficient evidence to raise a disputed question of material fact for the jury whether the delay in treatment had an adverse medical effect of decreasing his chance of clearing the virus and was sufficiently serious, even if he cannot show a physical injury.

Id. at *8.

visit with Dr. Mamis and his October 23[, 2007] consultation with Dr. Rush"); Motta v. Wright, No. 9:06 Civ. 1047, 2009 WL 1437589, at *15 (N.D.N.Y. May 20, 2009) (three and a half year delay in Hepatitis C treatment; "[t]he court . . . [found] that plaintiff ha[d] not raised a material issue of fact regarding the objective factor in the Eighth Amendment analysis [because t]here [wa]s no evidence that the delay was 'substantially serious'"; plaintiff had not offered evidence that "drug therapy in 2002 or 2003 would have been any more successful than the course of therapy [plaintiff] received in 2006," and thus had "not raised a genuine issue regarding the objective prong of the test"); Farid v. Ellen, No. 01 Civ. 8292 (PKC), 2006 WL 59517, at *10-11 (S.D.N.Y. Jan. 11, 2006), aff'd, 593 F.3d 233 (2d Cir. 2010) (granting summary judgment in Hepatitis C delay in treatment case, where "[d]espite plaintiff's detailed record of various alleged lapses by defendants in treating his condition, plaintiff has come forward with no evidence of how this alleged delay exacerbated his condition or worsened his prognosis for effective treatment"; "no reasonable jury could conclude that the alleged delay in plaintiff's medical treatment caused any harm to him that would be actionable under the Eighth Amendment"); Graham, 2004 WL 1794503, at *5 (granting summary judgment in delay in treatment Hepatitis C case where evidence showed that plaintiff had "no more than a five percent chance" of responding to the medication had it been administered earlier).

Here, Plaintiff has not introduced "verifying medical evidence" that his Hepatitis C condition worsened as a result of the delay in treatment, or that he faced a worse prognosis as a result of the delay in treatment. Indeed, the undisputed evidence shows that once Ray received treatment, the virus was quickly eradicated, and he remains virus-free. (Pltf. Resp. to 56.1 (Dkt. No. 103) ¶ 45 (citing Nadler Decl., Ex. 10 (Zamilus Dep.) (Dkt. No. 102-10) at 316:24- 319:5;

Nadler Decl., Ex. 23 (DOC Guidelines) (Dkt. No. 102-26) at 12; Nadler Decl., Ex. 53 (Aug. 21, 2015 Follow-Up Appointment) at 2))

As to medical evidence, Ray offers only Dr. Koenigsmann's testimony that "there is much more urgency to treat" patients suffering from advanced fibrosis, because it may be "too late" to treat a patient "once a patient has cirrhosis." (Nadler Decl., Ex. 5 (Koenigsmann Dep.) (Dkt. No. 102-5) at 201:4-16, 203:10-21, 204:10-16) But Dr. Koenigsmann did not speak to the issue of whether Ray's Hepatitis C condition worsened – or whether he faced a risk of it worsening – as a result of the delay in treatment.

Instead of offering "verifying medical evidence," Ray relies on his own subjective account of symptoms he experienced during the eleven month delay in treatment. At his deposition, Ray testified that – between April 2012 and March 2013 – he experienced "vomiting," "diarrhea," "cold and flu-type symptoms," "a fog of major fatigue" such that he "barely [could] function," "abdominal pain like a sword" and that he felt as if he had been "run over by a truck." (Nadler Decl., Ex. 8 (Ray Dep.) (Dkt. No. 102-8) at 140:16-141:24, 232:12-234:7) Ray contends that all of these symptoms are associated with Hepatitis C. (Pltf. Opp. Br. (Dkt. No. 101) at 16, 24-25, 32)

DOC's Hepatitis C Primary Care Practice Guidelines indicate that the following "symptoms and consequences" are associated with a Hepatitis C infection:

> Approximately 20% of persons exposed to the virus develop symptoms which may include jaundice (yellowing of the skin and whites of the eyes), fatigue, dark colored urine, stomach pain, loss of appetite and nausea. After the initial infection, 15-25 percent will recover and 75-85 percent will become chronically infected (life-long infection). Approximately 70 percent of persons chronically infected may develop liver disease, sometimes decades after initial infection.

(Nadler Decl., Ex. 23 (DOC Guidelines) (Dkt. No. 102-25) at 10)

When asked at his deposition "what are the symptoms of . . . liver disease," Dr. Koenigsmann testified:

> You can develop ascites, which is fluid collections in the abdomen. You can have protein imbalances where you develop frank congestive heart failure, leg edema. You can have, I presume, to some degree fatigue. You can get problems with your – a substance called bilirubin as the liver fails and that can cause pigment changes, you turn yellow, you can have a lot of itching from that, and ultimately chronic hepatitis C can cause the development of liver cancer, which has a whole host of other symptoms and problems.

(Nadler Decl., Ex. 5 (Koenigsmann Dep.) (Dkt. No. 102-5) at 161:1-12) Dr. Koenigsmann further testified that symptoms could also include excess fluid in the abdomen that could result in abdominal pain. (Id. at 163:18-23) Nurse Shylo Goin Tavares testified that late-stage symptoms of HCV could also include "an enlarged liver, you could have pain in your liver area, which is your right upper quadrant of your abdomen." (Nadler Dec., Ex. 3 (Tavares Dep.) (Dkt. No. 102-3) at 18:12-20)

There is no evidence that Ray suffered jaundice, itching, heart failure, leg edema, dark colored urine, or liver cancer during the eleven-month delay in treatment.[8] There is evidence that Ray made Sick Call visits to Otisville's infirmary on July 2 and 3, 2012 because of a cold. According to an Admission and Discharge Summary entered on July 3, 2012 by Zamilus, at that time Ray suffered from "cold symptoms," "fever + chills," and "general malaise."

---

[8] Ray has submitted a letter he wrote to his mother on August 23, 2012, in which he states that "there is [b]lood in my urine." (Nadler Decl., Ex. 25 (Ray Letter) (Dkt. No. 102-28) at 4) This letter constitutes inadmissible hearsay and cannot be considered at summary judgment. See Fed. R. Civ. P. 56(c) (requiring parties to "produce admissible evidence to support [factual assertions]"); Presbyterian Church Of Sudan v. Talisman Energy, Inc., 582 F.3d 244, 264 (2d Cir. 2009) ("'only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment'") (quoting Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997)); Colon ex rel. Molina v. BIC USA, Inc., 199 F. Supp. 2d 53, 68 (S.D.N.Y. 2001) ("When deciding a motion for summary judgment, a federal district court may consider only admissible evidence.").

(Nadler Decl., Ex. 24 (Progress Notes) (Dkt. No. 102-27) at 2)  Ambulatory Health Record Progress Notes entered on July 3, 2012 state "cold Sx" "general malaise"; skin – cold + clammy" "fatigue" "fever/chills."  (Nadler Decl., Ex. 34 (Progress Notes) (Dkt. No. 102-37) at 2)  Notes entered on "7-2-1[2]" state that Ray was "coughing up green stuff" and "snotting up a lot." (Nadler Decl., Ex. 35 (Progress Notes) (Dkt. No. 102-38) at 2)  Ray was treated by Dr. Zamilus, and by July 4, Ray was "feel[ing] much better."  Doctor Zamilus's discharge sheet states that, by July 4, 2012, Ray had "no malaise."  (Nadler Decl., Ex. 24 (Progress Notes) (Dkt. No. 102-27) at 2-4)  In any event, there is no evidence that cold and flu-like symptoms are associated with a delay in receiving treatment for Hepatitis C.

Ray now alleges, however, that he was suffering from abdominal pain during the eleven-month period of delay, and he argues that this is a symptom that is associated with Hepatitis C.  (Pltf. Opp. Br. (Dkt. No. 101) at 16, 24-25, 32)  While the parties have provided extensive records concerning Ray's infirmary visits during the eleven-month period of delay – including visits on July 2 and 3, 2012, August 21, 2012, and November 29, 2012 – there is no indication in these records that Ray ever complained about stomach pain.  To the contrary, Dr. Zamilus's notes for Ray's August 21, 2012 visit indicate that Dr. Zamilus explicitly asked Ray whether he was experiencing abdominal discomfort, and Ray indicated that he "didn't have any complaint."[9]  (Nadler Decl., Ex. 10 (Zamilus Dep.) (Dkt. No. 102-10) at 222:6-15, 223:2-23; see Nadler Decl., Ex. 40 (Aug. 21, 2012 Progress Note) (Dkt. No. 102-43) at 2 (Dr. Zamilus circled "negative" for "ABD" – abdomen))  The Court concludes that Ray has not offered evidence

---

[9] While there are no medical records before the Court indicating that Ray complained about abdominal pain during the eleven-month period of delay in treatment, there is evidence that Ray complained about stomach pain on September 25, 2015, more than two years after his treatment for Hepatitis C had been completed.  (Cooney Decl., Ex. A (Sept. 25, 2015 Doctor's Visit) (Dkt. No. 107-1) at 2-3)

sufficient to demonstrate that he suffered abdominal pain that was caused by the delay in initiating treatment for his Hepatitis C condition.

More generally, the Court finds that Ray has not offered evidence sufficient to demonstrate that the alleged eleven-month delay in his Hepatitis C treatment (1) caused his Hepatitis C condition to worsen; (2) presented a risk that the eventual treatment would not be successful or otherwise caused him to have a worse prognosis; or (3) caused any adverse medical effect. Because Ray has not offered evidence sufficient to create a material issue of fact as to the objective prong of the Eighth Amendment inquiry, Defendants are entitled to summary judgment.

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is granted. The Clerk of Court is directed to terminate the motion (Dkt. No. 86) and to close this case.

Dated: New York, New York
      September 27, 2017

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge